# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# EASTERN DIVISION

**GAVILON GRAIN LLC**                                       **APPELLANT**

v.                          No. 2:17-cv-40-DPM

**M. RANDY RICE, as Chapter 7 Trustee**                     **APPELLEE**

## ORDER

**1.** Should Turner's contract-based disputes with Gavilon be arbitrated, as those parties agreed, or handled by the bankruptcy court in a turnover action, as the trustee for Turner's bankruptcy estate strongly urges? Turner was a grain broker. Among other things, it bought corn, rice, and soybeans from farmers and re-sold the grain to Gavilon and others. Gavilon was among Turner's largest customers. When Turner's business started wobbling from liquidity problems, the company sought to reorganize under the bankruptcy protections of chapter 11. The case was, in due course, converted to a chapter 7 liquidation proceeding. The trustee for Turner's estate is vigorously pursuing his statutory duties to gather, liquidate, and distribute Turner's assets for the benefit of the company's many creditors.

The trustee has filed almost fifty adversary proceedings, including this one against Gavilon, which has generated the current disagreement about

where the Turner/Gavilon disputes will be resolved. The trustee pleaded six claims—two for breach of contract, three for unjust enrichment, and one for turnover of all the money Gavilon owes Turner based on the first five claims.

The particulars of those underlying claims bear on the arbitration-versus-bankruptcy dispute. Count 1 alleges that Gavilon broke the parties' contracts by not paying for approximately $2.5 million of corn that Turner actually shipped and by not paying for extra freight charges incurred by Turner on other shipments when Gavilon changed delivery locations. The extra freight charges are, the trustee says, an approximately $6 million issue. Count 2 alleges another breach: leaving open older contracts with higher grain prices, while paying on newer ones at lower prices. Gavilon allegedly owes the bankruptcy estate $3.5 million on this score. Counts 3 and 4 make fallback claims for unjust enrichment, which echo the alleged breaches. Count 5 is a stand-alone claim for unjust enrichment that seeks approximately $2 million for Gavilon's cancellation of contracts. In Count 6, the trustee realleged all the facts and invoked 11 U.S.C. § 542, which, with immaterial exceptions, empowers the trustee to seek turnover from third parties of property of the bankrupt's estate, including certain debts. "At the time of the commencement

of this Bankruptcy Case," pleaded the trustee, "for its actions, Gavilon owed Turner Grain a mature debt of not less than $14 million." № 7-1 at ¶ 83. The trustee notes that this is the estate's largest potential asset.

Gavilon responded with a motion to dismiss and compel arbitration. It denied any liability. № 7-2 at ¶ 11. Each of the Turner/Gavilon contracts contained a provision requiring that all related disputes be arbitrated by the National Grain and Feed Association. Gavilon points out that this group has been resolving these kinds of disputes for more than a century. The parties stipulated that these arbitration provisions were enforceable. The parties also agreed that, though their terms varied a bit,* these provisions covered all Gavilon's claims against Turner. Relying on these undisputed prepetition agreements to arbitrate, and the strong federal policy favoring arbitration embodied in the Federal Arbitration Act, Gavilon pressed the arbitral forum.

---

*Here is an example: "Controversies and/or other disagreements between Buyer and Seller arising under this Contract shall be settled by arbitration which shall be a condition precedent to any right of legal action that either Buyer or Seller may have against the other party. Any arbitration shall be in accordance with the rules of the National Grain and Feed Association [NGFA]. At the time notice of arbitration is served by either Buyer or Seller upon the other, (i) if either is a member of the NGFA, the NGFA Arbitration Committee shall serve as the arbitrator; (ii) if neither is a member of the NGFA, the American Arbitration Association shall serve as the arbitrator." № 7-2 at 7.

The trustee countered with turnover. It is, he emphasized, an essential tool for gathering the debtor's property; and the United States Code denominates "orders to turn over property of the estate[]" as "core proceedings arising under title 11," which are within the bankruptcy court's exclusive jurisdiction. 28 U.S.C. § 157(b)(1) & (2)(E).

The bankruptcy court received full briefing, heard oral argument, and gave a thorough bench ruling agreeing in general with the trustee's position. № 7-7. The court acknowledged the parties' common ground: the arbitration provisions apply and, but for the bankruptcy, they must be enforced. The court applied the *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) framework to resolve the tension between the FAA and the Bankruptcy Code's turnover provision. The court recognized the deeply divided decisions on whether pre-petition accounts receivable are core or non-core matters under the Code. The court concluded that the trustee's complaint—in substance, if not form—presented a *bona fide* claim for turnover of a matured debt, a core proceeding. The court rejected Gavilon's argument (and supporting authorities) that, to qualify as estate property, Turner's claim had to be liquidated or undisputed. Because the trustee's turnover right springs from the

-4-

Bankruptcy Code, the court saw an inherent conflict with the FAA. The court recognized that the trustee had the burden of showing that Congress intended in the Code to override the FAA's mandate: enforce arbitration agreements just like any other contract. If Congress intended to limit or prohibit waiver of the bankruptcy forum for the turnover claim, then that intention would appear in the Code's text or legislative history or in the "inherent conflict between arbitration and the statute's underlying purposes." № 7-7 *at 37* (quoting *McMahon*, 482 U.S. at 227).

The court found no such intention in the words of the Code's turnover provision about debts. And it found none in the legislative history of that part of the Code. The court looked to the general legislative history of the Bankruptcy Code as glossed in the cases. The court noted four purposes that would be compromised if a turnover action had to be arbitrated: centralized resolution of purely bankruptcy issues; the need to protect creditors from piecemeal litigation; the court's undisputed power to enforce its own orders; and speedy resolution, either by rehabilitating debtors or liquidating their assets. Exercising its discretion, the court held that it should handle the Turner/Gavilon dispute for several reasons. It could probably do so more

quickly than an arbitrator; no expertise beyond basic accounting was required; and arbitration would harm creditors — the lack of discovery would hobble the trustee, who is a stranger to the underlying transactions, and the cost would mean less for creditors (eventually) in this administratively insolvent estate.

Gavilon has appealed. The trustee elected to have this Court decide the appeal. The legal questions are reviewed *de novo*, the judgment calls for abuse of discretion. *In re AFY, Inc.*, 461 B.R. 541, 545–46 (8th Cir. BAP 2012); *In re Canal Street Ltd. Partnership*, 269 B.R. 375, 379 (8th Cir. BAP 2001). Of course a court that makes a legal error abuses its discretion. *Kern v. TXO Production Corporation*, 738 F.2d 968, 970 (8th Cir. 1984).

**2.** Notwithstanding the care the bankruptcy court took in considering the tangled issues presented, a foundational legal error undermines the court's decision. The parties have several rather ordinary contract-related disputes. Liability isn't agreed or otherwise locked in. There's no mature debt at this point. So there's no work for the turnover power to do yet. The bankruptcy court's expansive reading of 11 U.S.C. § 542(b) creates an Article III issue that should be avoided, if possible, and can be avoided by reading the statute more narrowly. And the bankruptcy court's error about the nature of the trustee's

claim led to an incorrect balancing of the material considerations about the forum.

*First,* the FAA heralds the robust federal policy favoring arbitration agreements. The bankruptcy court noted this law but moved past it quickly. "A written provision in . . . a contract . . . involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In an unmistakably strong line of cases in the last three decades, the Supreme Court has implemented this pro-arbitration policy, turning back almost every effort to temper it. *E.g., American Express Company v. Italian Colors Restaurant,* 133 S. Ct. 2304 (2013); *CompuCredit Corp. v. Greenwood,* 565 U.S. 95 (2012); *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333 (2011); *Green Tree Financial Corp.–Alabama v. Randolph,* 531 U.S. 79 (2000); *Gilmer v. Interstate/Johnson Lane Corporation,* 500 U.S. 20 (1991). For example, the *Gilmer* Court found the ADEA and FAA harmonious: If the parties agreed to it, arbitration of ADEA claims can be compelled, despite the ADEA's statutory right to sue about violations "in any

-7-

court of competent jurisdiction." 500 U.S. at 26-29, 35. The FAA contemplates the possibility of non-enforcement, but only on grounds that would revoke any other contract. The sum of all this, the Court concludes, is that when an otherwise enforceable arbitration agreement — like those here — is in play, a tie goes to the runner.

*Second*, the text of the turnover statute doesn't indicate that Congress intended to eliminate arbitration in every circumstance where the trustee is seeking to recover an alleged debt to the estate. If disputed, my contention that X is my property does not make it so. The turnover statute says, with the key words emphasized:

> (a) Except as provided in subsection (c) or (d) of this section, an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.
>
> (b) Except as provided in subsection (c) or (d) of this section, *an entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order*, shall pay such debt to, or on the order of, the trustee, except to the extent that such debt may be offset under section 553 of this title against a claim against the debtor.

-8-

11 U.S.C. § 542(a)-(b). The trustee's turnover power is limited to "debt[s] that [are] property of the estate[.]" The obligation must be definite and certain: matured, payable on demand, or payable on order—these are the Code's words. The statute doesn't speak of alleged debts.

The companion statutory provision about the bankruptcy court's power in this area makes the same point from another direction. That court is authorized to enter final "orders to turn over property of the estate[.]" 28 U.S.C. § 157(b)(2)(E). Compare other parts of this section, which speak (variously) of handling "*proceedings* to determine, avoid, or recover" preferences and fraudulent conveyances, as well as "*determinations* of the validity, extent, or priority of liens[.]" 28 U.S.C. § 157(b)(2)(F), (H) & (K) (emphasis added). Of course some court activity comes before every order. But the law discerns a provision's meaning partly through the surrounding provisions. *United Savings Association of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 371 (1988). And these companion parts of the text indicate plenary bankruptcy court power in some areas, and limited power in others, such as turnover.

*Third*, the legislative history of § 542 does not suggest an intention to eliminate arbitration in any dispute where the trustee seeks recovery of property or money that supposedly belongs to the estate. The bankruptcy

court recognized this point in passing, but didn't explore it. Turnover came into the Bankruptcy Code in the 1978 Act, which encouraged reorganization. *United States v. Whiting Pools, Inc.*, 674 F.2d 144, 150–52 & n.13 (2d Cir. 1982), *affirmed*, 462 U.S. 198 (1983). As Judge Friendly's summary of the legislative history shows, the trustee's turnover power was designed in part to help keep the reorganizing business going and its cash flowing. *Whiting Pools*, 674 F.2d at 152–55. The Supreme Court specifically noted that "the reorganization context" in *Whiting Pools* informed its analysis of § 542(a), while reserving judgment on whether that provision has the same broad reach in liquidation proceedings. 462 U.S. at 208 n.17. The genesis of § 542 isn't determinative, of course. It's informative, though, in construing the statute's reach in general and the reach of § 542(b) in particular. Turner isn't reorganizing; it is being liquidated. That context suggests a narrower reading of § 542(b).

*Fourth*, the trustee's § 542 right to seek turnover, and the bankruptcy court's § 157 power to order it, must be read to avoid constitutional difficulties. This Court must "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989). Drawing the core/non-core line is famously difficult. *Stern v. Marshall*, 564 U.S.

-10-

462 (2011); *Northern Pipeline Construction Company v. Marathon Pipe Line Company*, 458 U.S. 50 (1982).

Notwithstanding the difficulty, or perhaps partly because of it, Article III requires courts to use great care in drawing this line. The bankruptcy court's conclusion that the trustee's claims against Gavilon are a core matter means that the bankruptcy court would have the last word in deciding those disputed contract claims. That court would give the final answer to these state law questions. There would be no recommendation to this Court with the opportunity for *de novo* review. *Wellness International Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015). And that interpretation of § 542 needlessly raises a constitutional issue: does the Constitution allow Congress to give the bankruptcy court this authority? *Compare Stern*, 564 U.S. at 503, *and Northern Pipeline*, 458 U.S. at 87. While *Northern Pipeline* arose in the context of the 1978 Act, the case's holding was about Article III. That narrow but important holding was common ground in *Stern*: "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Stern*, 564 U.S. at 494 (opinion of Roberts, C.J.) & 510 (Breyer, J., dissenting) (quotations

-11-

omitted). Neither the parties nor the bankruptcy court addressed the constitutional issue created by holding that the Turner/Gavilon dispute is a proper turnover action.

If a trustee is pursuing property where the estate's right is undisputed, and the proceeding is about putting a number on that debt and getting the money, that's surely a core matter under § 542. No one disputed, for example, that the McCarty Ranch Trust's notes to the Cassidy Land and Cattle Company were in default, and were fully matured by acceleration, so the bankruptcy court had authority to foreclose the mortgage and order proceeds turned over to pay these debts. *In re Cassidy Land and Cattle Company, Inc.*, 836 F.2d 1130, 1131 (8th Cir. 1988). At the other pole is the unjust enrichment claim arising from the cattle operation in the *Falzerano* case. The parties' disputes were about bills for taking care of the cattle, rent for some pasture, and net pre-petition profits from the operation. Sorting out that alleged debt, on the quasi-contract claim for unjust enrichment, was not within the reach of § 542(a). *In re Falzerano*, 686 F.3d 885, 886 (8th Cir. 2012). The estate's property interest was too unsettled to qualify. As the Court of Appeals pointedly noted, in general, turnover proceedings "are not to be used to liquidate disputed contract claims[]" — and "[a]dhering to this limitation seems essential after the Supreme

Court's recent decision in *Stern v. Marshall*, [564 U.S. 462] (2011)." *In re Falzerano*, 686 F.3d at 887 & n.2.

*Fifth*, the trustee's complaint against Gavilon makes claims that are too indefinite and uncertain to qualify as a *bona fide* turnover action. Recall Count 6, which seeks the turnover of $14 million. It is a tent for the five substantive claims. The trustee pleaded that this total is the mature debt Gavilon owes the estate. This is a conclusion, not facts showing a solid property right that would support a solid turnover claim.

Turning from form to substance, the answer is the same. By their nature, unjust enrichment claims are fuzzy and flexible. *United States v. Applied Pharmacy Consultants, Inc.*, 182 F.3d 603, 606–09 (8th Cir. 1999); RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 1, comment a (2011). On these matters of quasi-contract, there's almost always a dispute on liability, and there's no certainty until some adjudicator decides that the law implies a contract to prevent unjustified enrichment. *QHG of Springdale, Inc. v. Archer*, 2009 Ark. App. 692, 9–11, 373 S.W.3d 318, 324–25 (2009) (*en banc*). Gavilon's three unjust enrichment claims partake of this uncertainty. If the parties' contracts about destination-change freight charges, corn delivered but not paid for, priority of contracts to be filled, and cancellation can't be enforced for some

-13-

reason, then the nice questions that appeal to the law's conscience will arise. *Falzerano*'s teaching is that those questions are generally not for answering in a turnover case. 686 F.3d at 887-88.

The trustee's contract claims are similarly disputed. They exclude the cancellation issues, but raise all the other matters just described. The unpaid bills for grain shipped and the unpaid delivery charges are essentially receivables on Gavilon's account. Whether there was some breach in leaving some contracts open and closing others is a state law matter, too. Gavilon has not agreed that it owes anything on various claims asserted. If it had, and if the dispute were merely about how much, then the trustee would have a stronger case for turnover. *Compare In re Cassidy*, 836 F.2d at 1131, *with In re Charter Company*, 913 F.2d 1575, 1579 (11th Cir. 1990). The trustee and Gavilon are not in that middling situation, though.

Section 542(b) speaks of the estate's property in a "matured" debt. The bankruptcy court was right to consider that word's common law meaning. *U.S. Department of Health and Human Services v. Smith*, 807 F.2d 122, 124 (8th Cir. 1986). Gavilon's obligations to the estate, the trustee alleged and argues, are mature because Turner fully performed by shipping the grain. Unlike the buyers in the *Total Transportation* case, however, Gavilon has not agreed that

-14-

Turner fully performed. *Compare In re Total Transportation, Inc.*, 87 B.R. 568, 574-75 (D. Minn. 1988). On the freight charges, for example, the trustee acknowledges that the parties dispute why Turner changed delivery locations. Was it for Turner's convenience, or at Gavilon's direction? № *8 at 21–22*. And Gavilon doesn't agree that it failed to pay for corn delivered; Gavilon argues instead that it paid all the money it owed. № *8 at 31–32*.

The neighboring words in § 542(b) that describe what debts are subject to turnover are sidelights on what Congress meant by "matured." *Utility Electric Supply Inc. v. ABB Power T & D Co., Inc.*, 36 F.3d 737, 740 (8th Cir. 1994). Turnover of debts "payable on demand" and "payable on order" covers situations where the obligations are strong and clear, not uncertain. In *Cassidy*, the entire debt on the note was payable because of the undisputed default. 836 F.2d at 1132–33. That obligation was clear; and so the turnover action was proper. *Ibid.*

But the debt need not be liquidated. Gavilon is mistaken in arguing to the contrary. As the bankruptcy court pointed out, that word appears in other Code provisions, but not in § 542(b). The reasonable inference is that Congress made choices in using this qualifying word or not. Requiring the amount of debt to be liquidated — what the word book describes as "settled or determined,

especially by agreement" — moves too far from the statute's text. BLACK'S LAW DICTIONARY 1072 (10th ed. 2014). If a third party's liability on a debt is clear, then turnover is a proper vehicle for the trustee, even if the bankruptcy court must determine the exact amount owed. *In re Cassidy*, 836 F.2d at 1132–33.

On the record presented, the turnover statute does not require the reading adopted by the bankruptcy court. If these alleged debts are mature enough to be property of the estate, then almost every receivable will be, notwithstanding disputes about whether the debt exists. Granting the many efficiencies that could be gained by finally adjudicating all these kinds of matters in the bankruptcy court, this reading of § 542(b) raises constitutional difficulties that can be avoided. As the leading commentator notes, construing § 542(b) so broadly would obliterate *Northern Pipeline*'s holding about Article III's mandate. 1-3 COLLIER ON BANKRUPTCY ¶ 3.02 (16th ed. 2017).

*Sixth*, the Court is unpersuaded by the trustee's alternative arguments. Gavilon didn't waive its right to seek arbitration by filing a claim early in the case. The bankruptcy court has authority to finally adjudicate that claim, including to decide any intertwined issues, even if they involve (for example) destination-change charges, cancellation, or the like. 28 U.S.C. § 157(b)(2)(B). The bankruptcy court's general authority under § 157(b)(2)(A) and (O) does not

salvage this adversary proceeding either. The Court of Appeals has cautioned that these two "catchall" provisions must be read narrowly. *In re Cassidy*, 838 F.2d at 1132. To deny arbitration here because the trustee's claims are "matters concerning the administration of the estate" or "proceedings affecting the liquidation of the assets of the estate" would effectively erase the core/non-core line, as well as break faith with the Supreme Court's pro-arbitration decisions. *Ibid.*

\* \* \*

The trustee's substantive claims against Gavilon must be arbitrated by the National Grain and Feed Association. Adjudicating whether Gavilon owes any debts that are property of Turner's chapter 7 estate is non-core. As the bankruptcy court noted, the weight of authority favors enforcing arbitration agreements that cover non-core matters. The bankruptcy court, therefore, is not the only place where the debt question can be answered. The parties' undisputed pre-petition arbitration agreements cover the trustee's contract and unjust enrichment claims. There is no irreconcilable conflict between the trustee's statutory right to turnover (eventually) of a matured debt that is the property of Turner's estate and having an arbitration to resolve the Gavilon/trustee dispute about whether any such debt exists. If one does, and

-17-

Gavilon doesn't pay it, *then* the trustee can seek turnover and the bankruptcy court can order it. The bankruptcy court's concerns about limited discovery and cost will be present to some extent in every arbitration. They are not weighty enough here to tilt the balance against the alternative forum. While this Court has no doubt that the bankruptcy court could ably unravel the Turner/Gavilon knot, those parties agreed to another forum, and the substantive claims asserted by the trustee are insufficiently definite in terms of liability to be within the turnover statute's reach at this point.

The bankruptcy court's order denying Gavilon's motion to compel arbitration, *№ 31* in No. 2:16-ap-1149, is reversed and the matter is remanded with instructions: The bankruptcy court must stay the trustee's adversary proceeding against Gavilon and compel arbitration of the five state law claims. Thereafter, the trustee can pursue turnover in the bankruptcy court if need be.

So Ordered.

*DPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

16 August 2017